# United States District Court
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

SCOTT L. HEAGNEY, §
    Plaintiff, §
  §
v. §    Civil Action No.   4:22-cv-675    
  §
MERRICK GARLAND, ATTORNEY §
GENERAL, U.S. DEPT. OF JUSTICE, §
    Defendant. §

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Heagney was a high-performing GS-14 Supervisory Special Agent (SSA) in the Dallas Field Division of DOJ's Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF).  After SSA Heagney supported the discrimination claims of a female Special Agent, management labelled Heagney a problem employee, reassigning him to a non-supervisory job in Virginia that later resulted in his involuntary retirement.

Plaintiff sues under Title VII on the basis of reprisal. Consider this timeline:

- November 12, 2019—Annual performance rating of 6 out 7, with comments such as "Scott is a good team member and works well in a collaborative environment" and "your group has really excelled."

- April 3, 2020—Heagney's supervisor emails him that, "I really appreciate all you do and your leadership…You are really doing a great job."

- July 24, 2020—The EEO Report for the female Special Agent is released and includes Heagney's affidavit supporting her discrimination claims.

- August 25, 2020—The head of the Dallas ATF office claims that Heagney was being reassigned because of  "several years" of unprofessionalism.

Compare to the ATF Director's 2022 comments (italicized = handwritten):

[Y]our success as a criminal investigator and law enforcement leader made an impact on many lives, and your wealth of knowledge and experience will be missed as you begin life in retirement…*Scott, Thank you for 20 years of dedicated service to the Bureau…*

## JURISDICTION AND ADMINISTRATIVE EXHAUSTION[1]

1.      This Court has jurisdiction for reasons such as that:

    1.1.      the suit raises federal questions (28 U.S.C. § 1331), such as claims arising under Title VII (e.g., 42 U.S.C. § 2000e-16);

    1.2.      Title VII authorizes suits by federal employees under procedures applicable to the private sector (42 U.S.C. § 2000e-16(d));

    1.3.      a plaintiff may bring a mixed-case lawsuit under 5 U.S.C. § 7702(e) anytime more than 180 days after the EEO complaint filing if there has been no final agency action on the claim;

    1.4.      this suit is one to enforce civil rights (28 U.S.C. § 1343); and

    1.5.      the suit seeks declaratory and injunctive relief under the Declaratory Judgment Act (28 U.S.C. § 2201, per authorization of 5 U.S.C. §§ 702-03).

2.      Plaintiff brings this district court action after exhausting administrative remedies. For example:

    2.1.      He timely filed administrative complaint #ATF-2020-01946, raising events such as the involuntary reassignment and a negative rating.

        2.1.1.  No Final Agency Decision has been issued for this EEO case notwithstanding the passage of more than 180 days.

    2.2.      He timely filed administrative complaint #ATF-2022-000286, raising events such as his involuntary retirement effective February 21, 2022.

---

[1] Assertions in this pleading are made in addition and in the alternative to each other, based on the limited amount of information available prior to discovery.

2.2.1.  No Final Agency Decision has been issued for the mixed case (EEO claim + adverse action claim) portion after passage of over 120 days.

3.  Plaintiff mitigated his damages to at least the extent required by law and  complied with all conditions precedent to bringing this suit. For example, as to mitigation:

3.1.  He sought professional medical care to deal with the stress associated with the events described below.

3.2.  He repeatedly urged management not to proceed with the reassignment.

## PARTIES AND SERVICE

4.  Defendant Merrick Garland is sued in his official capacity as the Attorney General, heading the executive department of which ATF is a component.

4.1.  He is being served by certified U.S. Mail to: The Hon. Merrick Garland/Attorney General/U.S. Department of Justice/950 Pennsylvania Ave., NW/Washington, DC 20530.

4.1.1.  With copies to:

4.1.1.1.  Assistant Attorney General for Administration/U.S. Department of Justice/Justice Management Division/950 Pennsylvania Ave., NW/Room 1111/Washington, DC 20530.

4.1.1.2.  Civil Process Clerk/U.S. Attorney for EDTX/600 East Taylor St., Ste. 2000/Sherman, TX 75090.

4.1.2.  With courtesy copy to ATF Office of Chief Counsel, via email to attorney Katherine Bolton via katherine.bolton@atf.gov.

5.  Plaintiff Heagney is an individual who resides in the Northern District of Texas. He may be contacted by way of the undersigned attorney.

6.    Plaintiff was an "employee" (e.g., serving in the competitive service and not in a probationary period) and so subject to the protections provided by law for federal employees whose employment is terminated (e.g., 5 U.S.C. § 7511 et seq.).

## VENUE

7.    Venue is appropriate in the Eastern District of Texas, Sherman Division, for reasons such as that it is where records regarding Plaintiff's employment relevant to the challenged actions are maintained and administered (42 U.S.C. § 2000e-5(f)(3)).

   7.1.   The principal office of the ATF Dallas Field Division is located at 2501 S. State Hwy 121 Business, Suite 300A, Lewisville, Texas 75067.

   7.2.   [If Defendant contends that venue is more appropriate in the District of Columbia, where ATF is headquartered and where Plaintiff's supervisor for the new job was located, Plaintiff will not oppose transfer. SAC Boshek claimed the decision to reassign Plaintiff was made by HQ management.]

## SUMMARY OF LEGAL CONTEXT

8.    Title VII, at 42 U.S.C. § 2000e-16(a), requires actions affecting federal employees to be "made free from any discrimination" based on grounds such as sex.

9.    Title VII also prohibits related retaliation against federal employees, at least where the challenged action undertaken by the employing agency might dissuade a reasonable employee from making or supporting a charge of discrimination.

10.   One way of demonstrating a prima facie case of Title VII reprisal is for a plaintiff to show that the plaintiff engaged in protected activity, then suffered an adverse action, and that there was a causal relationship between the two.

11.     A retirement or resignation initiated by an employee nonetheless may be shown to
        be an involuntary action, such as by evidence that the employee resigned in the
        face of intolerable discrimination.

   11.1.     In other words, in a situation where the employer's retaliation causes
             working conditions to have become so intolerable that a reasonable person
             in the employee's position would have felt compelled to resign or retire.

12.     In response to an employee's prima facie claim of retaliation, an employer may
        respond by describing how it acted based on legitimate, non-retaliatory, grounds.

13.     The employee may then reply by showing the employer's stated justification is
        false, serving as pretext for one or more actions actually motivated by reprisal.

14.     Where the challenged action(s) would not have occurred but for reprisal, a
        successful federal employee Title VII plaintiff may obtain full relief—for example,
        reinstatement, backpay, compensatory damages, and attorney fees.

15.     Where reprisal was instead merely one motivating factor, the employee may obtain
        relief that is prospective and declaratory in nature, along with attorney fees.

16.     A reassignment may be sufficiently adverse to meet the reprisal burden of proof
        (i.e., would dissuade a reasonable worker from filing or supporting an EEO claim)
        where it is objectively worse than the prior position.

17.     For example, it can be relevant that one or more of these is true as to the new
        position:

   17.1.     it is less prestigious;

   17.2.     it is less interesting;

   17.3.     it is non-supervisory, versus the prior one's being supervisory;

   17.4.     it is effectively a demotion due to a loss of responsibility; and

17.5.   it provides less opportunity for advancement.

18.   A termination of federal employment of a non-probationary employee like Plaintiff Heagney in the competitive service must be preceded by due-process protections, such as advance written notice of the basis for the action, an opportunity to respond in writing to it, a written decision explaining its reasoning, and the opportunity to appeal the action (e.g., to the U.S. Merit Systems Protection Board).

18.1.   Denial of such due process requires reversing an involuntary retirement.

19.   In a mixed case (MSPB + EEOC issues), an employee may start the administrative process with either EEOC or MSPB, before later proceeding to the other or court.

## SUMMARY OF FACTUAL CONTEXT

### Plaintiff Was Well-Regarded Prior to His EEO Activity

20.   Prior to his EEO activity in support of a female Special Agent's [hereafter using "S.J." as pseudonym for her] discrimination/reprisal claims, Group Supervisor/SSA Heagney was considered by management to be a high performer.

21.   For example:

21.1.   Around July 8, 2018, Special Agent in Charge (SAC) Jeff Boshek [head of the ATF Dallas Field Division] gave Plaintiff Heagney a temporary promotion to serve in the role of acting Assistant SAC (ASAC).

21.2.   Around August 15, 2018, the group of agents that Plaintiff Heagney supervised received an award for superior performance.

22.   Around September 30, 2018, SSA Heagney received an annual evaluation with comments from SAC Boshek including this: "Scott, It's been a pleasure working with you this year. Thanks for working so hard to get your group to that 'next level.'"

23.   Among management comments in the Overall Summary section for that evaluation were:

I appreciate the energy you have put toward your group. You have improved the productivity and complexity of investigative work. You have given newer agents developmental opportunities. You supported the mission... Thank you for your all your efforts, I hope you can continue with it this year.

24.   Around May 26, 2019, SSA Heagney received from management a discretionary within-grade pay increase, which is consistent with satisfactory performance.

25.   Around November 12, 2019, SSA Heagney received his next annual review, with an overall rating of six out of a possible seven points.

26.   Among the immediate supervisor's comments were:

26.1.   "Scott is a good team member and works well in a collaborative environment."

26.2.   "Scott is tactful and diplomatic, even in challenging or stressful situations."

26.3.   "Scott's group covers a large area and he is effectively balancing conflicting duties. His people are positive and upbeat. The morale in his group is high because of Scott's leadership."

26.4.   "I have enjoyed working with Scott this past year and look forward to watching the investigations in Scott's group this next FY. Scott please keep up the great work this next year!"

27.   The Midyear Progress Review included supervisor comments that SSA Heagney should "continue to inspire your agents" and about how "[t]hey respect you and want to work for you."

28.     Among SAC Boshek's comments in that annual review were:

> Thanks for all of your hard work this past year.
> With the change in focus and AOR [Area of Responsibility],
> your group has really excelled.
> It's been fun to watch as your agents have taken your lead and
> developed some great cases. Looking forward to a great FY20.

29.     Among the remarks in the Overall Summary for that FY2019 review were that "Scott is a strong leader and has the loyalty of his group" of agents and that morale was high in his group because of his leadership.

30.     The Summary concluded with "Scott please keep up the great work this next year!"

31.     Around April 3, 2020, Plaintiff's immediate supervisor (ASAC John Wester) emailed him that "I really appreciate all you do and your leadership."

32.     ASAC Wester also said to SSA Heagney in that email that Heagney was "really doing a great job."

33.     It was not only management that held SSA Heagney in high regard, as reflected by input from his colleagues (in their individual capacities) that was collected and provided to ATF management in response to the reassignment of Plaintiff:[2]

33.1.   One ATF Special Agent (S.D.) remarked on always having a "great appreciation for [SSA Scott Heagney's] straight forwardness and leadership of both young and experienced agents."

---

[2] ATF has the signed statements and knows the full name of those identified with initials.

33.2.   An agent (J.M.) who had worked for SSA Heagney commented that:

Scott has always been extremely trustworthy and conscientious. During the time I worked for him I never once felt he put me at risk. In fact it was the opposite. Unlike other supervisors Scott always came out to participate on operations. Scott always showed a great deal of integrity in everything he did. You cannot say the same for other ATF managers.

33.3.   An ATF (A.W.) agent who had worked for Plaintiff described him as "one of the best supervisors I have had at ATF."

33.4.   Another agent (A.S.) who had reported to SSA Heagney found him to be "one of best leaders I know. Leads from the front and looks out for his people."

33.5.   An ATF agent (D.W.) who had work for Plaintiff observed, "Great boss!"

33.6.   N.G., who also had worked for Plaintiff, noted that "Scott Heagney was one of my favorite supervisors to work for in my 17 years of law enforcement."

33.7.   Similarly, Agent C.J. commented that "Scott is the best supervisor that I ever had. Outstanding supervisor and an even better person."

33.8.   Agent S.L. found Plaintiff Heagney to have been "one of the best supervisors I have had the pleasure to work for in my 22 years in law enforcement." S.L. added that SSA Heagney's "professionalism, character and credibility is unquestioned and above reproach."

33.9.   Another ATF agent (J.W.) described Plaintiff as a "great boss" for whom it was "an honor" and a privilege to work.

33.10.  Another subordinate (H.C.) likewise found SSA Heagney to be "by far the best supervisor I have had in my 21 years with ATF."

33.11.  Agent K.B. considered Plaintiff to be "one of the best supervisors I have ever worked for."

33.12.  A local municipal police officer (J.W.) who worked under Plaintiff as a Task Force Officer rated him as 10 on a scale of 1-10 for categories among which were "professionalism," "credibility," "engagement with the job," "compliance with ATF rules," and "protection of agent safety."

33.13.  Another police officer (M.O.) found SSA Heagney to be a "very safe, organized and outstanding ATF Supervisor."

33.14.  An Assistant U.S. Attorney (T.B.) who prosecuted numerous cases from ATF agents supervised by Plaintiff remarked that, "Agents I interact with love and respect him and have no complaints. Many agents have said he is one of the best supervisors they have ever had."

34.  Of statements collected from ATF Special Agents, police officers, and other law enforcement colleagues, on a scale from 1 to 10, he was rated:

34.1.  As a 10 for professionalism by 80% of those responding, a nine by three other colleagues, and an eight by the remaining two responders.

34.2.  For protection of agent safety, 24 responders gave him a 10, with the remaining colleague rating him as a nine.

34.3.  (Notwithstanding such ratings from those who served in law enforcement with SSA Heagney, Dallas Field Division management—as detailed further below—would claim after SSA Heagney's EEO activity that Heagney was lacking in professionalism and failed to protect agents working for him.)

35.  "S.J.", the female agent for whose EEO complaint SSA Heagney provided an affidavit supporting her sex discrimination/retaliation claims, separately wrote

that in her nine years with ATF, she'd had seven supervisors at the GS-14 level and numerous acting supervisors.

36.     She explained that of that large group of former supervisors, there was only one other she could rate as highly as she did SSA Heagney.

37.     She also remarked how she found Group Supervisor Heagney to be "one of the finest supervisors in the agency" and a person for whom a "commitment to the well being of the agents in his command is paramount."

### Plaintiff Heagney Engages in Protected EEO Activity

38.     As part of responding to the claims of sex-based discrimination and EEO retaliation by Special Agent "S.J.", ATF headquarters contracted with a third-party to prepare an EEO Report of Investigation.[3]

39.     Among the witnesses from whom an affidavit was obtained was SSA Heagney.

40.     His mid-June 2021 statement recounted Dallas-area management's openly discussing the EEO activity of "S.J." around him though he wasn't supervising her.

41.     SSA Heagney also testified to how "S.J." had been misled into believing that she would be allowed to work fire scenes if she agreed to transfer to a new group, but then management like ASAC John Wester implemented policies designed to keep her from doing such work.

42.     Heagney further testified that Wester's rules for the female agent were "out of the ordinary and rather sudden. I have never been told something like this before."

43.     The affidavit also contended Wester's actions were surprising and "very unusual."

---

[3] The EEO claims of "S.J." later were resolved by agreement with ATF during processing by the EEOC hearings unit; their merits are not at issue in the present case.

44. SSA Heagney's statement further described a conversation with the female agent's immediate supervisor in which that supervisor and Heagney "both agreed that ASAC Wester seemed to be arbitrary and capricious" in his actions involving the female agent, raising the possibility this could be "seen as retaliatory" given the female agent's ongoing "complaints and EEO activity."

45. Around July 24, 2020, ATF EEO staff formally released the Report of Investigation for the complaint of "S.J." to Special Agent "S.J." and agency management staff.

    45.1. [It remains to be determined in discovery how much earlier SAC Boshek may have become aware that SSA Heagney gave the mid-June 2021 affidavit that detailed the impropriety of management actions toward "S.J."]

**Plaintiff's EEO Activity Leads to a Fall from Grace**

46. Around August 19, 2020, SSA Heagney was informed by SAC Boshek he would be involuntarily transferred from the Dallas area to a job with ATF HQ.

47. Plaintiff Heagney objected that the action was in retaliation for his EEO activity.

48. SAC Boshek responded that he had no advance knowledge of the reassignment other than being told the previous night of it by the ATF Assistant Director.

49. SAC Boshek and the two ASACs present claimed they had no idea why Plaintiff was being transferred and that they felt horrible having to deliver the news to him.

50. They further denied having submitted SSA Heagney's name for the assignment and said it was a surprise, not an action to punish, nor due to performance problems.

51. The new position was to serve as ATF liaison to the National Targeting Center, which is operated by the U.S. Department of Homeland Security's Customs and Border Protection component.

51.1.   Though classified as under ATF headquarters, the liaison position actually is located in Sterling, Virginia—some 30 or more minutes from ATF HQ.

51.1.1.  It does not involve regular interaction with agency HQ officials.

52.   As SSA Heagney continued to express concern over the involuntary reassignment, SAC Boshek changed his explanation of how it came to be.

53.   In an August 25, 2020 email to SSA Heagney, SAC Boshek asserted that he had not given the full story in the August 19 meeting because of Heagney's "obvious emotional distress" at being told of the forced (cross-country) relocation.

54.   In this email, Boshek now claimed the reassignment was the result of performance problems on the part of SSA Heagney. For example, Boshek asserted that:

54.1.   "Over the past several years, you have repeatedly lacked professionalism, failed to communicate and abused confidences."

54.2.   SSA Heagney had "shown a deliberate disregard for ATF policies and procedures[,] placing your agents and [Task Force Officers] under unnecessary risk."

54.2.1.  Compare to the input from some 25 of SSA Heagney's law enforcement colleagues described above and their high scoring of him in categories like professionalism, following policy, and protecting agents.

55.   The August 25, 2020 email also claimed that "no one in the Dallas Field Division was involved in the selection process."

55.1.   Actually, SAC Boshek requested Plaintiff be reassigned out of Dallas.

56.    Around September 23, 2020, SSA Heagney filed his own EEO complaint, asserting the reassignment to HQ was in reprisal for his affidavit supporting the EEO claims of sex discrimination and reprisal lodged by female Special Agent "S.J.".

57.    Around December 7, 2020—a date after SAC Boshek had learned SSA Heagney was pursuing an EEO complaint—Heagney received his next annual review.

    57.1.    As with the prior two reviews, Boshek served as the second-level supervisor.

    57.2.    As with the prior review, ASAC John Wester was the first-line supervisor.

58.    In this December 2020 annual review, ASAC Wester included some 15 or more negative comments. For example, management used the appraisal to allege:

    58.1.    Plaintiff did not properly complete paperwork (SLOT forms).

        58.1.1. This was cited in at least two different places in the review.

    58.2.    Plaintiff repeatedly didn't know the status of his group's work.

    58.3.    Plaintiff was merely "generally effective" working in a collaborative environment or as a team member.

        58.3.1. Compare to prior year's finding that "Scott is a good team member and works well in a collaborative environment."

    58.4.    Plaintiff was only "generally" tactful and diplomatic.

        58.4.1. Compare to prior year's finding that "Scott is tactful and diplomatic, even in challenging or stressful situations."

59.    The appraisal's record of the (earlier) Midyear Progress Review did not warn of how negatively his performance purportedly was viewed by management, but instead merely commented that "Heagney's performance meets and/or exceeds all critical elements for his position. Please continue to work on communication and please keep up the hard work Scott."

60. In contrast to prior years, the Overall Summary for this 2020 rating had only criticism of his work and left out the praise SAC Boshek usually gave him.

61. As to the surprisingly negative tone of this 2020 rating, consider this timeline:

    61.1. October 1, 2019—Review rating period starts for the fiscal year.

    61.2. April 3, 2019—John Wester, Plaintiff's first-line supervisor, emails Plaintiff that he's "really doing a great job" and that Wester "really appreciate[s] all you do and your leadership."

    61.3. Late July 2020—Wester leaves the ASAC job for one at HQ and so no longer supervises SSA Heagney.

    61.4. Late August 2020—SSA Heagney goes off work related to the stress and does not return until 2021, such that there was no further work he was doing this FY from which to conclude he was having performance problems.

    61.5. September 30, 2019—The annual rating period ends.

62. In other words, the numerous negative comments would appear purportedly to reflect some precipitous decline in performance between April 5 and late July 2020, a period that happens to overlap with Plaintiff's initial EEO activity.

63. SSA Heagney wrote ASAC Wester to point out the timeline and resulting appearance of reprisal, requesting removal of the negative comments, to no avail.

64. Oddly, the December 2020 evaluation made no mention that during this rating year Plaintiff Heagney had served as Group Supervisor for agents working on a gang case that resulted in their receipt of the ATF Distinguished Service Medal.

65. It is typical for a Supervisory Special Agent seeking a promotion to ASAC to have to provide the most recent annual performance appraisal document.

66. The FY20 performance appraisal was sufficiently negative in tone that it would be make it unlikely for Plaintiff to be selected for a promotion, such that the rating was a management action that might persuade a reasonable employee from supporting or making an EEO complaint if they knew such a rating would result.

67. The stress of the reassignment situation caused Plaintiff to be off work from late August 2020 until being released for full return to work in March 2021.

68. The Agency forced SSA Heagney to continue to expend leave until April 9, 2021.

69. Due to Plaintiff's absence from work under his doctor's and counselor's care, as well as the impact of the COVID pandemic on agency operations, and then ATF's declining to let Plaintiff return to work until a doctor of ATF's own choosing cleared him, the forced in-person relocation to the position in Virginia was delayed.

   69.1.   (Plaintiff nonetheless had begun reporting remotely to a supervisor at HQ.)

70. Finally, a November 17, 2021 directive was issued that gave Plaintiff a final in-person reporting deadline for the job in Virginia of February 13, 2022.

   70.1.   This was issued in a time period when Plaintiff's first EEO complaint was before the EEOC hearings unit, awaiting assignment to a judge.

**Plaintiff Finally Gives Up his ATF Career and Gives Notice of Retiring**

71. Plaintiff gave notice of his retirement on December 16, 2021, to be effective February 21, 2022.

72. Among considerations (not in ranked order) in Plaintiff's concluding he had no real choice but to retire rather than physically relocate to the Sterling, Virginia area to accept the position of ATF liaison to the CBP Targeting Center were:

72.1.   The reassignment appeared to be intended to punish him for his protected EEO activity [see Pretext discussion further below] and in that sense was illegal.

72.2.   The job involved a loss of supervisory responsibilities.

72.3.   The loss of supervisory duties would make it less likely that Plaintiff would be selected for promotion to an ASAC position (a traditional next step for a Group Supervisor/Supervisory Special Agent) seeking to move up.

72.4.   The job was less prestigious and less interesting in going from supervising agents actively pursuing criminal cases in the field to sitting full time behind a desk with no expectation of work in the field.

72.5.   The new position would isolate Plaintiff from interaction with other ATF staff, being located a half hour or more from ATF headquarters.

72.6.   The position was one that could be filled by someone of a lower grade than Plaintiff and in that sense effectively was a demotion.

72.6.1. For example, ATF's Criminal Investigations Division (CID) FY 2022 goals, as announced in a January 6, 2022 email, included this:

**Goal #3**
By Q3FY22, CID will establish a liaison partnership with CBP and HSI at the National Targeting Center (NTC). CID will assign a part time IRS liaison to the NTC.

By Q4FY22, CID will assign a full time Special Agent liaison to the NTC.

72.6.2. In other words, the position could be filled by a non-supervisory Intelligence Research Specialist rather than immediately with a Special Agent.

72.6.3. Non-supervisory ATF Intelligence Research Specialists are typically graded lower than Plaintiff's GS-14 position.

72.7. Plaintiff would have to move his family from the Dallas area, where his wife was employed, to the National Capital Region.

72.7.1. This likely would require his wife to find a new job.

72.7.1.1.    She is employed as a Family Support Therapist in the DFW area and likely would have to be relicensed if moving to Virginia.

72.8. The position would be a step back in Plaintiff's career advancement as he already had served time at headquarters and instead should be seeking positions in the field at the ASAC level, and eventually the SAC level.

72.8.1. He previously served as an HQ liaison to INTERPOL.

72.9. The position was described to Plaintiff by management as a good fit for his experience in dealing with issues along the border with Mexico but he in fact did not have such experience.

73.   In light of such considerations, being involuntarily transferred from the Supervisory Special Agent/Group Supervisor position in the Dallas area across country to serve as a liaison to CBP in Sterling, Virginia is an action that might persuade a reasonable worker from engaging in EEO activity.

### More Evidence of Pretext

74.   There are many reasons to believe that the reassignment of Plaintiff out of the Dallas area and into the job in Sterling, Virginia was motivated by reprisal rather than because of legitimate, non-discriminatory reasons.

75. For example, management claimed the new job would make good use of Plaintiff's experience in dealing with issues related to the border with Mexico, but (as noted earlier) he had no such experience.

76. While ATF management typically may be expected at some point to serve in an HQ position, Plaintiff already had done so, serving as a liaison to INTERPOL.

77. Deputy Assistant Director John Durastanti in an August 25, 2020 call with Plaintiff explained the reassignment to the liaison job in Virginia with words to the effect of "We need someone who will represent ATF well."

    77.1. This is inconsistent with Dallas SAC Boshek's email to Plaintiff *the same day*, explaining the reassignment was necessitated by "several years" of Plaintiff's demonstrating a lack of professionalism.

    77.2. It is also inconsistent with ATF Assistant Director Thomas Chittum's claim the reassignment was due to Heagney's "history of disruptive behavior."

78. As detailed earlier, Plaintiff was praised for his high performance before his EEO activity, then condemned as a long-time problem employee not long after it.

79. As also detailed earlier, performance areas cited by SAC Boshek as giving rise to the need to move out of a supervisory position (e.g., lack of professionalism and failure to protect agents) were ones for which Plaintiff's law enforcement colleagues rate him very highly.

80. When management officials such as Boshek were asked in mid-2022 by an EEO investigator to provide documentation of a history of performance problems on the part of Plaintiff, none was produced.

81. Another justification asserted by SAC Boshek and Assistant Director Chittum for Plaintiff's having to be reassigned was that Plaintiff had *Giglio* issues (i.e., that

Plaintiff's credibility had been challenged in a manner that would preclude him from being relied on to testify in court, as his credibility issues would have to be disclosed to the attorneys for a defendant in a criminal case).

82.  This *Giglio* claim is a fabrication and SAC Boshek knows or should know it.

    82.1.  For example, back on October 31, 2019, the ATF Professional Review Board issued a "Memorandum of Clearance" finding that Plaintiff was cleared of any misconduct.

        82.1.1. This was as to the same issues alleged by Boshek and/or Chittum to have created *Giglio* issues for Plaintiff.

83.  The clearance letter was delivered to Plaintiff by ASAC John Wester, who signed it on November 12, 2019.

84.  It would be customary for ASAC Wester, as Plaintiff's first-line supervisor at the time, to share the results of the review with Plaintiff's immediate supervisor SAC Boshek, given the significance of *Giglio* matters.

85.  The claims of Plaintiff's having *Giglio* issues were not raised again with Plaintiff between his being cleared in November 2019 and when in mid-2022 Boshek/Chittum raised this to the EEO investigator as a basis for having to reassign Plaintiff to the job in Sterling, Virginia as a liaison to CBP.

86.  Assistant Director Chittum claimed to the EEO investigator that he met with SAC Boshek in May 2019 to suggest immediate reassignment of SSA Heagney due to *Giglio* issues, yet the reassignment of Plaintiff to the job in Virginia was not announced until mid-August 2020 (post-EEO-activity and well after the *Giglio* question was resolved in November 2019).

87.   In his affidavit for the initial EEO Report of Investigation over Plaintiff's claims, AD Chittum justified the reassignment on the basis of the supposed *Giglio* issues, Plaintiff's alleged "history of disruptive behavior," and the match between Plaintiff's experience and the duties of the CBP liaison job.

88.   But as set out earlier, the *Giglio* issue had been resolved, Plaintiff earlier was praised for his diplomacy and tact, and Plaintiff did not have experience dealing with the southwest border issues associated with the new job.

89.   AD Chittum also claimed SAC Boshek advised him Plaintiff was not a high-performing supervisor (contrary to Boshek's positive comments in the 2018 and 2019 annual appraisals and ASAC Wester's April 2020 emailed praise of Heagney).

   89.1.   [Plaintiff in discovery expects to determine who among ASAC Wester, SAC Boshek, DAD Durastanti, and AD Chittum personally had a motive to retaliate against Plaintiff and who among the others merely served as the cat's paw to accomplish ASAC Wester's/SAC Boshek's reprisal goals.]

90.   Assistant Director Chittum was someone who had served as a mentor and supporter for ASAC Wester such that Chittum likely would have motivation to retaliate against Plaintiff for Plaintiff's EEO testimony disclosing wrongdoing by Wester.

91.   The animosity toward Plaintiff and claims of his poor performance were not universal among top agency management.

92.   For example, in January 2022, the person then serving as Director of ATF sent a letter to Plaintiff thanking him for his service to the agency.

93.     Among other things, the Director wrote Plaintiff Heagney that his "success as a criminal investigator and law enforcement leader made an impact on many lives, and your wealth of knowledge and experience will be missed as you begin life in retirement."

   93.1.   In an additional handwritten note, the Director remarked, "*Scott, Thank you for 20 years of dedicated service to the Bureau.*"

94.     The acting Director had reason to be aware of Plaintiff's ATF career and reputation as the Director earlier had worked in the Dallas Field Division.

95.     As an example of how the involuntary transfer of Plaintiff to the HQ job violated agency policy, consider the Permanent Change of Station (PCS) funding rules.

   95.1.   ATF PCS policy requires that relocations at government expense be undertaken only where the candidate possesses "unique skills not easily found in the area to which the move is being made…" Exceptions require director-level approval.

   95.2.   Yet apparently no effort was made to first post the vacancy for volunteers/candidates in the National Capital Region.

96.     Other supervisors in the ATF Dallas office (such as J.P. and B.G.) had been in Dallas longer without having the standard ATF mobility agreement used to force them through a rotation at a HQ job.

97.     The position description for the new job (A93-024 Criminal Investigator, GS-1811-14 Program Manager/Operations Officer, CBP National Targeting Center) states the incumbent functions as a "principal ATF spokesperson and point of contact regarding the assigned program or function," also presenting briefings to other law enforcement agencies, about "extremely

sensitive, controversial, complex and critical law enforcement issues that have far-reaching potential impact." The "Supervisory Controls" for the job say that work assignments "are provided with only the most general of instructions, and are generally limited to overall parameters and policy concerns."

97.1.   If Heagney were truly as unreliable and untrustworthy as SAC Boshek has alleged him to be, and if he had the *Giglio* issues alleged, it would make no sense to put him in such a sensitive liaison position.

## LEGAL CLAIMS

98.   One or more of Defendant's actions toward Plaintiff violated Title VII as applied to federal employees in that they were because of Plaintiff's protected EEO activity (e.g., giving affidavit supporting female agent's EEO claims and then pursuing his own EEO claims when suffering reprisal).

99.   For example, ATF retaliated against Plaintiff by:

99.1.   reassigning him out of the supervisory position in the Dallas Field Division to a non-supervisory, less-desirable position in Virginia;

99.2.   issuing an FY2020 appraisal full of negative remarks, making it more difficult for Plaintiff to obtain a promotion to an ASAC job; and

99.3.   forcing Plaintiff to retire, when finally requiring him to report in person for the job in Virginia.

100.   [Plaintiff earlier challenged a one-day suspension flowing from his reaction to the news of the reassignment, but does not raise it in this suit given the higher-priority issues raised above.]

101.  The Defendant violated Plaintiff's due-process rights by forcing him to involuntarily retire, without providing the due process required to be granted to an employee like Plaintiff in advance of an involuntary termination.

102.  ATF had notice of Plaintiff's claims and was given multiple opportunities to resolve them prior to the filing of this suit, but chose not to do so.

103.  As a result of Defendant's violations, Plaintiff suffered in the past and will continue to suffer in the future damages.

104.  Plaintiff was required to retain legal counsel to protect his rights.

### DAMAGES AND RELIEF SOUGHT

105.  Plaintiff requests that the Court grant the following relief, in addition to any other in law or equity to which it may find him entitled:

    105.1.  A finding that Plaintiff's retirement was involuntary and without due process, such that it should be retroactively reversed and he be returned to the ATF payroll with back pay and benefits.

    105.2.  A finding that the reassignment to the job in Virginia was in retaliation for his protected EEO activity and so should be retroactively voided.

    105.3.  A finding that the FY2020 appraisal was in retaliation for his protected EEO activity and so should be retroactively voided.

    105.4.  An order that the Court retain continuing jurisdiction over Defendant and require ATF to make regular reports for a period of at least 12 months as to steps it is taking to prevent future violations of Title VII prohibitions against retaliation.

105.5.   An award to Plaintiff of compensatory and economic damages.

105.6.   Restoration of leave used by Plaintiff between August 20, 2020 and March 28, 2021, when off for medical care related to the stress associated with the retaliatory reassignment.

105.7.   Back pay and benefits for any Leave Without Pay used between March 28, 2021 and April 8, 2021 (while awaiting ATF permission to return to work).

105.8.   An award of attorney's fees and expenses.

105.9.   An award of costs and of interest.

106.   To the extent not returned to Defendant's payroll, Plaintiff seeks the value of lost front pay and benefits in addition to any back pay and benefits.

## JURY REQUEST

107.   Plaintiff requests that a jury resolve all factual issues.

## PRAYER

FOR SUCH REASONS, Plaintiff requests judgment be entered in his favor, that he be granted relief like that described above, and that Defendant denied relief of any kind.

Respectfully Submitted,

SCHLEICHER LAW FIRM, PLLC
510 Austin Ave., Ste. 110
Waco, TX 76701
(254) 776-3939
(254) 776-4001 fax

By:   David R. Schleicher   david@gov.law
David R. Schleicher
TX Bar No. 17753780